## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PATRICIA STEWARD,** | ) | **Civil Action No. 3:12-203** |
| | ) | |
| **Plaintiff,** | ) | **Judge Kim R. Gibson** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ALTOONA FIRST SAVINGS BANK,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

### I. Introduction

Plaintiff Patricia Steward ("Plaintiff") has filed this civil action against her former

employer, Defendant Altoona First Savings Bank ("Defendant" or the "Bank"), alleging

violations of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§

621 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. C.S.A. §951, *et*

*seq.*[1] Pending before the Court is a motion for summary judgment (ECF No. 30) filed by

Defendant. For the reasons that follow, Defendant's motion for summary judgment will

be denied.

---

[1] For present purposes, Plaintiff's state law claim under the PHRA is identical to her federal claim under the ADEA. *See Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002) ("[T]he PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently."). Accordingly, for the sake of simplicity, the Court will address only Plaintiff's ADEA claim, but its analysis will apply in all respects to Plaintiff's PHRA claim as well. *See Connors v. Chrysler Financial Corp.*, 160 F.3d 971, 972 (3d Cir. 1998) ("There is no need to differentiate between [the plaintiff's] ADEA and PHRA claims because, for our purposes, the same analysis is used for both.") (citations omitted).

## II. Jurisdiction and Venue

The Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and § 1367. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2).

## III. Factual Background[2]

Plaintiff was born in 1945 and began working for Defendant in 1999 as a mortgage originator at the age of 54. (Pl.'s Dep. at 58, ECF No. 36-1). She remained in that position until approximately 2004, when she was made branch manager of Defendant's Duncansville office. (ECF No. 34 ¶ 2; ECF No. 43 ¶¶ 1, 3).

While serving as the Duncansville branch manager, Plaintiff continued to perform loan and mortgage origination duties similar to those she had previously performed. (ECF No. 34 ¶¶ 2-3; ECF No. 43 ¶ 3). Plaintiff was told that her job as branch manager would still require her to be out in the public generating business for Defendant and that the assistant branch manager, Shannon Lobello, now Shannon Block, ("Block"), would be responsible for the day-to-day operations of the branch. (ECF No. 34 ¶¶ 3-4).

At the time that Plaintiff was serving as manager of the Duncanville branch office, there were five tellers. (ECF No. 34 ¶ 5). Some of these tellers, along with Block, maintain that, as manager, Plaintiff was difficult to get along with and caused office conflict and discord. (*Id.*). Among other things, they claim that Plaintiff gossiped frequently, referred to other employees as "bitches" or "back-stabbers," pitted the tellers against one another,

---

[2] The factual background is derived from the undisputed evidence of record and the disputed evidence of record viewed in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

and told them that they could not trust each other, board members, or managers. (ECF No. 34 ¶¶ 6, 8-9, 12-14, 17). Block testified that Plaintiff refused to assist with or be trained to do certain teller functions—such as running the teller line, ATM, and balancing of the vault—because she felt these tasks were "beneath" her. (ECF No. 34 ¶ 6). One of the tellers, Deborah Sackett, similarly testified that Plaintiff refused to help with these duties. (*Id.* ¶ 13). Sackett, Block, and another teller, Mary Ann Hughey, all testified that they complained about Plaintiff's conduct to the Bank's management. Sackett maintains that she complained about Plaintiff to Gary Pfahler, the Bank's President, and Troy Campbell, the Bank's Executive Vice President. (ECF No. 34 ¶ 13). Block contends that she likewise complained to Campbell and Pfahler; however, Block admits that she asked Pfahler not to approach Plaintiff about her complaints because she did not want to cause more "friction" in the office. (Block Dep. 24-27, ECF No. 38-2). Hughey maintains that, at one point, she complained to Block and Campbell following an incident in which Plaintiff made complaints about her that were unsubstantiated. (ECF No. 34 ¶ 11). Campbell acknowledged that "things were communicated from branch personnel" which led him to conclude that the Duncansville branch "wasn't a cohesive unit." (Campbell Dep. 73, ECF No. 37-2). Although Pfahler denies having had any direct communication with employees from the Duncansville branch, he claims to have learned of their complaints from Campbell. (Pfahler Dep. 69-70, ECF No. 39-1). Both Campbell and Pfahler agree that the perceived problems at the Duncansville branch office were not discussed with Plaintiff. (Campbell Dep. 74, ECF No. 37-2; Pfahler Dep. 69-70, ECF No. 39-1).

In 2008, Defendant created a business development team (the "Business Development Team" or "Team"). (ECF No. 34 ¶ 20). Plaintiff, who was 63 years-old at the time, was transferred from her position as branch manager to a position on the Team, while still working out of the Duncansville office. (ECF No. 34 ¶¶ 21-22). In connection with this transfer, Plaintiff assumed the title of Assistant Vice President of Business Development and was given a $3,000 raise. (Pfahler Dep. 16, ECF No. 39-1; Steward Aff. ¶5, ECF No. 36-2). According to Pfahler, Plaintiff was placed in this new position because she was "very personable," was known in the community, had contacts in the community, and was better suited to working outside of the office. (Pfahler Dep. 17, ECF No. 39-1). Allen Harr, who had served as manager of Defendant's Bedford branch office, was also transferred to the Business Development Team and given the title of Assistant Vice President of Business Development. (ECF No. 34 ¶ 21). Harr was born in 1966 and is twenty-one years younger than Plaintiff.

Initially, the Business Development Team consisted of Louisa Lobre-Riley (who supervised the Team), Plaintiff, Harr, and Patrick Nagle. (Pl.'s Dep. 30, ECF No. 36-1). Plaintiff continued to work out of the Duncansville branch with Lobre-Riley, while Nagle worked in the Altoona office and Harr continued to work out of the Bedford branch. (Steward Dep. 31-33; Nagle Dep. 72; Harr Dep. 60-61; Campbell Dep. 53). Plaintiff's job duties as a member of the Business Development Team included generating all types of business for the Bank, including loans, deposits, and credit card services. (ECF No. 40-5; ECF No. 43 ¶ 9).

4

In February or March of 2009, Lobre-Riley resigned her position, and Nagle, the Bank's Vice President of Lending, became the head of the Business Development Team with direct supervisory authority over Plaintiff and Harr. (Nagle Dep. 17-21, ECF No. 38-3; Pl.'s Dep. 34-35, ECF No. 36-1; *see also* ECF No. 34 ¶¶ 26, 28). On October 3, 2009, Nagle issued individual performance evaluations for Plaintiff and Harr. Nagle found that both Plaintiff and Harr knew the Bank's products well and worked hard for their customers. (ECF No. 40-4 at 1; ECF No. 40-6 at 1). Nagle gave both employees "exceptional" marks in terms of their respective involvement and representation of the Bank in the community. (ECF No. 40-4 at 2; ECF No. 40-6 at 2). In addition, both Plaintiff and Harr received "generally satisfactory" ratings in the category of work volume, but they were each advised to focus on obtaining more commercial loans and to be more "effective" with their sales calls. (ECF No. 40-4 at 1-2; ECF No. 40-6 at 1-2). Nagle observed on each of their forms that evaluating performance was very difficult in the absence of sales goals or standards. (ECF No. 40-4 at 2; ECF No. 40-6 at 2).

Plaintiff continued to work on the Defendant's Business Development Team until January 2011, when, at age 66, her position was eliminated.[3] (ECF No. 43 ¶ 57). There is no dispute that Pfahler, as the Bank's president, had sole authority to make hiring and firing decisions and that he was the individual responsible for eliminating Plaintiff's job. (ECF No. 43 ¶ 26). There is disagreement, however, with respect to the circumstances that led to Plaintiff's removal from the Business Development Team.

---

[3] Defendant alleges that the decision to terminate her job was communicated to Plaintiff on January 11, 2011, while Plaintiff maintains that she was terminated on January 7. (*See* ECF No. 34 ¶ 48 and Plaintiff's response). For present purposes, this discrepancy is immaterial.

5

According to Defendant, Pfahler began to develop concerns around June 2009 that the Bank needed to cut expenses due to a decline in earnings. (ECF No. 34 ¶ 32). Based on monthly production reports showing the number of loans generated, the dollar amount of loans generated, and the fees generated by the loans, Pfahler determined that he needed to eliminate a position in the Business Development Team. (*Id.* ¶ 33). Pfahler testified that he continued to monitor the situation over the course of the ensuing year by watching the monthly loan production numbers. (*Id.* ¶ 34). In June 2010, he decided to eliminate Plaintiff's position. (*Id.* ¶¶ 35-38). He testified that his reasoning in this regard was two-fold: first, Nagle had generated substantially more loans that Plaintiff in the Altoona market and could remain in that market; second, Harr had higher loan numbers than Plaintiff and was established in the Bedford market. Accordingly, Pfahler felt it was prudent to keep Harr in the Bedford market where he could continue to generate loans for the Bank. (*Id.* ¶ 40). Although Pfahler made the decision in June 2010 to eliminate Plaintiff's position, he states that he delayed doing so until January 2011 so that Plaintiff could have the benefit of a full year's salary and could maximize her 401(k) distribution. (*Id.* ¶ 39).

Plaintiff disputes that there was any financial need to eliminate her position, as she maintains the Bank was doing well financially in 2010 and there was enough business to support three members of the Business Development Team. In addition, Plaintiff contests the notion that members of the Business Development Team had assigned "territories" or particular sales quotas. She claims that, like Harr, she had ties to the Bedford community and had previously been responsible for loan origination in that area. She maintains that

6

her loan numbers were not substantially lower than Harr's and that, in any event, the Bank preached a philosophy of teamwork as opposed to a focus on individuals' sales numbers. (ECF No. 34, Plaintiff's responses to ¶¶ 32-36, 40, 47).

In the one or two months prior to Plaintiff's termination, a vacancy arose with respect to the position of branch manager in the Defendant's Altoona office. (ECF No. 34 ¶ 50; Pl.'s Dep. 43, ECF No. 36-1). It is undisputed that Plaintiff expressed an interest in this position but was not selected for the job. (ECF No. 34 ¶¶ 50-51 and Plaintiff's responses thereto). The parties are in disagreement as to the reasons why Plaintiff was not selected.

Defendant contends that it never received any formal application from Plaintiff relative to the branch manager position and, in any event, Plaintiff would not have been a good fit for that job. According to Pfahler, the Altoona branch office was suffering from morale problems and the Bank was looking for a special person to fill that position in order to rebuild a team. (ECF No. 34 ¶¶ 50-51). Ultimately, Pat Labriola was hired as the Altoona branch manager and began working in that capacity in June of 2011. (*Id.* ¶¶ 52-53). Defendant maintains that it hired Labriola because he had prior experience in banking and as an elementary school principal, and Pfahler believed Labriola had strong communication and morale building skills that would be a good fit for the Altoona office. (*Id.* ¶ 54).

Plaintiff disputes Defendant's assertion that she never applied for the branch manager position. Plaintiff contends that, in addition to expressing interest in the job verbally during her termination meeting, she sent an employment application to the

7

attention of Pfahler, who had the ultimate hiring authority. (ECF No. 34, Plaintiff's response to ¶ 51). Moreover, Plaintiff claims that, shortly before she was fired, she inquired whether Pfahler had hired a branch manager for the Altoona office. According to Plaintiff, Pfahler responded, "[N]o. The only applications I got were from old people, and I don't want them." (Pl.'s Dep. 56, ECF No. 36-1).

In December of 2010, the month prior to Plaintiff's termination, the Bank also had a vacancy with respect to the assistant branch manager position in the Altoona office. (ECF No. 34 ¶ 57). There is no dispute that Plaintiff did not apply for this position because she was not aware in December 2010 that she would soon be eliminated from the Business Development Team, and the open assistant branch manager position was filled that same month. Plaintiff nevertheless contends that she should have been considered for this position because it was known, as of December 2010, that she would be losing her job and it was the Bank's general practice to place its employees in alternative jobs in lieu of terminating them. Defendant contends that it selected Terry Drass, a 49 year-old employee, to be the assistant branch manager because Drass had been filling that position on a temporary basis for the previous year and had performed her duties "admirably." (ECF No. 34 ¶ 57).

Following the termination of her employment, Plaintiff commenced administrative proceedings with the EEOC. Plaintiff appears to have properly exhausted her administrative remedies, and Defendant does not contend otherwise.

Plaintiff subsequently filed this lawsuit on September 18, 2012. Defendant filed its pending motion for summary judgment (ECF No. 30) and supporting materials (ECF Nos.

8

28, 29, 31) on November 15, 2013.[4] Plaintiff filed her memorandum, appendix, and counterstatement of facts in opposition to Defendant's motion (ECF Nos. 34, 35, 36, 37, 38, 39, 40, 41) on December 16, 2013. Thereafter, Defendant filed its reply brief (ECF No. 44) and response to Plaintiff's counterstatement of facts (ECF No. 43) on December 30, 2013. Plaintiff filed her sur-reply brief (ECF No. 49), with leave of Court, on January 16, 2014. The issues raised by Defendant's motion have thus been fully briefed and are now ripe for disposition.

## IV.    Standard of Review

Summary judgment is appropriate only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Melrose, Inc. v. Pittsburgh,* 613 F.3d 380, 387 (3d Cir. 2010). Issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *see also McGreevy v. Stroup,* 413 F.3d 359, 363 (3d Cir. 2005). Material facts are those that will affect the outcome of the trial under governing law. *Anderson,* 477 U.S. at 248. The Court's role is "not to weight the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *American Eagle Outfitters v. Lyle & Scott Ltd.,* 584 F.3d 575, 581 (3d Cir. 2009). "In making this determination, 'a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that

---

[4] Defendant filed an errata to its memorandum in support of its motion for summary judgment (ECF No. 32) on November 18, 2013.

9

party's favor." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegations or denials" of the pleading, but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 288, 232 (3d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 n. 11 (1986)). "For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position – there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply, Inc. v. American States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993).

## V. Discussion

The ADEA prohibits employers from discriminating against an individual with respect to hiring, discharge, compensation, terms, conditions, or privileges of employment because of the individual's age. 29 U.S.C. § 623(a)(1). Here, Plaintiff asserts that Defendant violated the ADEA with respect to three distinct adverse employment actions: (1) the elimination of her position from the Business Development Team; (2) the failure to hire her for the Altoona Branch Manager position; and (3) the failure to hire her for the Altoona Assistant Branch Manager position.

10

Plaintiff's age discrimination claims are governed by the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). Under this framework, Plaintiff bears the burden of establishing a *prima facie* case of discrimination. *See Fasold v. Justice*, 409 F.3d 178, 183–84 (3d Cir. 2005). Once Plaintiff has established a prima facie case, the burden shifts to Defendant to identify legitimate justifications for the adverse employment action. *Id.* The burden of production then returns to the Plaintiff, who must produce evidence showing that her employer's proffered justifications are pretextual. *Id.; see also Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009).

To cast doubt on a company's proffered reasons for an adverse employment action, it is not enough to show that the company's decision was "wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). Instead, the plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence," *Burton v. Teleflex Inc.*, 707 F.3d 417, 427 (2013) (*quoting Fuentes*, 32 F.3d at 765) (internal quotation marks omitted), and could thus "infer . . . that the employer engaged in the adverse employment action for an invidious reason," *id.* (*citing Fuentes*, 32 F.3d at 764).

With these principles in mind, the Court will address each of the challenged employment decisions in turn.

## A. The Removal of Plaintiff from the Business Development Team

Plaintiff first challenges Defendant's decision to remove her from the Business Development Team. Defendant argues that it is entitled to summary judgment with respect to this employment action because: (1) Plaintiff cannot establish a *prima facie* case of age discrimination, and (2) Plaintiff cannot demonstrate that Defendant's explanation for the employment decision was pretextual.

### 1. *Prima Facie* Case

Defendant has represented that it eliminated Plaintiff's job because Pfahler perceived a need to cut the Bank's expenses. Accordingly, the Court construes the challenged employment decision as akin to a reduction-in-force. In order to establish a *prima facie* case of age discrimination under these circumstances, Plaintiff must show that (1) she is forty years of age or older; (2) Defendant took an adverse action against her; (3) she was qualified for the position at issue; and (4) the Defendant retained another similarly situated employee who was sufficiently younger to support an inference of discriminatory animus. *Monaco v. American General Assur. Co.*, 359 F.3d 296, 300-01 (3d Cir. 2004); *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 249-50 (3d Cir. 2002). Here, Defendant argues that Plaintiff cannot establish the fourth prong of her *prima facie* case because it did not retain a sufficiently younger and similarly situated individual. While Plaintiff points to Harr, who was twenty-one years her junior, as the relevant comparator, Defendant maintains that Harr was not similarly situated to Plaintiff because he served an entirely different market and generated more loans and higher fees than Plaintiff.

12

The Third Circuit Court of Appeals "has not explicitly stated what constitutes a similarly situated employee," but it "accept[s] the standard used by other circuits that to be considered similarly situated, comparator employees must be similarly situated in all relevant respects." *Wilcher v. Postmaster General*, 441 F. App'x 879, 881-82 (3d Cir. 2011) (citing *Russell v. University of Toledo*, 537 F.3d 596 (6th Cir. 2008); *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259–261 (5th Cir. 2009)). "A determination of whether employees are similarly situated takes into account factors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." *Wilcher*, 441 F. App'x at 882 (*citing Lee*, 574 F.3d at 259–261; *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744 (7th Cir. 2006)).

Plaintiff has adduced sufficient evidence to support a reasonable conclusion that she and Harr were similarly situated employees in all relevant respects. Both Steward and Harr were Assistant Vice Presidents of Business Development supervised directly by Nagle and subject to the hiring and firing decisions of Pfahler. (ECF No. 43 ¶¶ 12, 44.) There appears to be no dispute that, as Assistant Vice Presidents of Business Development, Plaintiff and Harr shared the same general job responsibilities. In fact, Campbell described Harr and Steward as being in "equal positions" (*id.* at ¶ 13), and Nagle evaluated Plaintiff and Harr in 2009 using the exact same form for both individuals. (ECF No. 40-4 and 40-6.)[5] Viewing the record in the light most favorable to Plaintiff, a

---

[5] Although Defendant attempts to distinguish Plaintiff and Harr based on their respective "markets" as well as their respective loan production figures, the validity of this comparison is more appropriately addressed as part of the "pretext" analysis, since Defendant has cited these factors in support of its nondiscriminatory explanation for eliminating Plaintiff's job. Stated differently, Defendant's attempt to distinguish Harr and Plaintiff in this fashion merely begs the

factfinder could reasonably determine that Plaintiff and Harr were similarly situated employees.

## 2. Pretext

Defendant next argues that, even if Plaintiff can establish a *prima facie* case, she has not produced sufficient evidence to support a finding that the Bank's proffered explanation for her removal was pretextual. Here, Defendant has satisfied its burden under the *McDonnell-Douglas* framework of articulating a legitimate, nondiscriminatory reason for removing Plaintiff from the Business Development Team. Specifically, Defendant claims its decision was based on economic considerations: *i.e.*, the Bank was affected by the economic downturn in 2008 and Pfahler concluded there was a need to cut expenses by eliminating Plaintiff's job. Defendant contends that Pfahler made the decision to eliminate Plaintiff after monitoring monthly production reports that showed the number of loans generated, the dollar amount of loans generated, and the fees generated by those loans. Defendant explains that the logical choice was to eliminate Plaintiff's position because her numbers were lower than those of the other team members, and her supervisor, Nagle, was already established in the Altoona market and could remain there. According to the Defendant, Harr serviced a different market than

---

question whether their respective "markets" and loan production figures were "relevant aspects" of their jobs for purposes of a *prima facie* comparison. In any event, as is discussed in more detail below, there is evidence in the record from which a factfinder could draw a reasonable inference that: (a) Harr and Plaintiff did not serve distinctly different "markets;" and (b) a comparison of Plaintiff's and Harr's respective loan production numbers did not figure into the challenged employment decision.

14

Plaintiff in that he had significant ties to the Bedford area, and it therefore made sense to have him continue working in the Bedford Market.

To show pretext, an employee must submit evidence that either: (1) casts doubt on the legitimate reason proffered by the employer so that a factfinder could reasonably conclude that the reason was a fabrication; or (2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause for termination. *Klastow v. Newtown Friends School,* 515 F. App'x 130 (3d Cir. 2013) (citing *Fuentes v. Perskie,* 32 F.3d 759, 762 (3d Cir. 1994)). In this case, Plaintiff has attempted to do both.

As an initial point, Plaintiff disputes the Bank's assertion that it needed to cut her position due to a decline in earnings. She testified that, at the Christmas party in December 2010 – approximately one month prior to her termination, Pfahler announced that the Bank was doing "fantastic" because of its lending. (ECF No. 43 ¶ 48). Plaintiff further attests that, in December 2010, all of the Bank's employees received a year-end bonus of one month's pay, which was twice the amount that had been given in prior years. (ECF No. 43 ¶ 49; Pl. Aff. ¶ 9).[6] Joseph Stevens, one of the Bank's board members,

---

[6] Plaintiff's averment relative to end-of-year bonuses is set forth in her post-deposition affidavit (ECF No. 36-2), which Plaintiff signed three days prior to submitting her papers in opposition to Defendant's motion for summary judgment. Citing *Jiminez v. All American Rathskeller, Inc.,* 503 F.3d 247, 253 (3d Cir. 2007), Defendant argues that the Court should not consider any aspect of Plaintiff's affidavit to the extent it is being offered to create an issue of fact. In referring to *Jiminez,* Defendant appears to be invoking the "sham affidavit" doctrine. The court in *Jiminez* explained the doctrine as follows:

> A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment. A sham affidavit cannot raise a genuine

testified that, despite Plaintiff's personal loan production numbers being down during this time, loans overall were increasing because of the bank's policy of changing its focus from mortgages to commercial loans. (ECF No. 43 ¶ 50; Stevens Dep. 12, ECF No. 39-3). Pfahler similarly acknowledged that the number of commercial loans closed in 2009 was almost twice the amount closed in 2007. (ECF No. 43 ¶ 53). Although the Bank's commercial loans decreased by 12 percent between 2009 and 2010, its fees were down less than $10,000 in 2010, while mortgages and home equity loans increased by 136 percent and 275 percent, respectively. (*See* ECF No. 32 at 6-7; *see also* Def.'s Ex. H, ECF No. 29-8).[7] When viewed in the light most favorable to Plaintiff, the foregoing facts would entitle a reasonable factfinder to discredit the Defendant's purported economic need to eliminate a position from the Business Development Team.

---

issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant. . . . [*Anderson v.*] *Liberty Lobby* specifically recognizes the trial judge's power to grant summary judgment on disputed records. . . . Therefore, if it is clear that an affidavit is offered solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude that no reasonable jury could accord that affidavit evidentiary weight and that summary judgment is appropriate.

503 F.3d at 253 (citing internally to *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). Defendant suggests that Plaintiff's affidavit falls into the "sham" category because her attorney asked some questions during her deposition and, according to Defendant, "the averments in paragraphs 3 through 13 [of the affidavit] should have been raised at that time." (Def.'s Reply to Pl.'s Resp. to Def.'s Mot. Summ. Judg. 11, ECF No. 44.) This Court does not read *Jiminez* to preclude consideration of a plaintiff's affidavit merely because the plaintiff was questioned in some respect by her own counsel at the time of her deposition, nor has Defendant referred the Court to any other decisions so holding. Because the Court does not view Plaintiff's affidavit as being in conflict with her prior deposition testimony, the Court will consider the affidavit as competent evidence for purposes of its Rule 56 analysis.

[7] Although Defendant disputes these figures as unsupported by Plaintiff's proffered documentation (*see* ECF No. 43 ¶¶ 51-52), the Court notes that the figures cited by Plaintiff are independently supported by Defendant's own documentation, as referenced in the body of Defendant's memorandum. (*See* Def.'s Mem. of Law in Supp. Mot. Summ. Judg. 6-7, ECF No. 32).

16

There is also evidence in the record that casts doubt on the Defendant's suggestion that Plaintiff's loan production figures were a key indicator of her performance. Although Plaintiff does not dispute that her loan production numbers were lower than those of other Team members, she denies that she was ever counseled or reprimanded, either by Lobre-Riley or by Nagle, concerning this issue while serving on the Business Development Team. (ECF No. 36-1 at 33-34). Although Nagle remarked in Plaintiff's 2009 evaluation that she should put "more effort" into obtaining potential commercial loan customers and that her "sales calls need[ed] to be more effective" (ECF No. 40-4 at 2), Nagle rated Plaintiff's performance that year as "generally satisfactory" or "fully satisfactory" in all areas. (*Id.* at 1-2). Plaintiff testified that the Business Development Team did not have any formal sales goals (ECF No. 36-1 at 38), and this is corroborated by Nagle's comment on Plaintiff's 2009 evaluation form that it was "very difficult" to perform an evaluation "when there are no goals or standards." (ECF No. 40-4 at 2). Plaintiff also testified that, when she spoke to Pfahler about her concerns that Nagle was calling on her customers and excluding her from the loan discussions, Pfahler told her, "[W]e are a small bank. We don't care where the numbers are or whose name they're under. As long as we know you're out there working for our bank, we do not care about the numbers." (ECF No. 36-1 at 39). According to Plaintiff, she was told this "a couple times" within the few years that Nagle served with her on the Business Development Team. (*Id.*). Notably, Nagle gave Plaintiff an "exceptional" rating in this regard, noting that she was "excellent in community affairs" and "very involved." (ECF No. 40-4 at 2). Pfahler similarly testified that Defendant, unlike big banks, did not have sales quotas and

17

instead "pride[s] [itself] on service to the customer, not so much on sales." (ECF No. 39-1 at 17).

Plaintiff also challenges the legitimacy of Defendant's explanation as to why it terminated her position instead of Harr's. Plaintiff contends that Defendant's differentiation between herself and Harr based on territorial considerations is disingenuous because, like Harr, she had significant ties to the Bedford community. (ECF No. 43 ¶ 16). Pfahler acknowledged that, during her years as a loan originator prior to 2006, Plaintiff had covered Blair and Bedford Counties. (ECF No. 39-1 at 13). Plaintiff testified that, even though she worked for the Business Development Team out of the Duncansville office, she was not confined to that area. (ECF No. 36-1 at 35). She claims the Team members "had no territory" and that her business was "all over; some Bedford, Huntingdon, some in Cambria County, wherever we could get business. There was no territory for anyone." (*Id*.). To that end, Plaintiff was involved with the Bedford area Chamber of Commerce and had business relationships with Trademark Homes and Coldwell Banker in the Bedford area. (ECF No. 43 ¶ 17). According to Plaintiff, Pfahler had reason to know of Plaintiff's involvement in the Bedford area because he personally approved her requests to have the Bank pay for her activities with the Bedford Chamber of Commerce. (Pl.'s Aff. ¶ 12, ECF No. 36-2).[8] This evidence is sufficient to cast doubt on Defendant's assertion that Plaintiff and Harr served distinctly different market areas.

---

[8] Although Defendant objects to the Court's consideration of averments taken from Plaintiff's post-deposition affidavit, the Court will consider those averments for the reasons previously discussed, *supra*, at n. 6.

18

In addition, the evidence would permit a reasonable factfinder to disbelieve Defendant's assertion that it relied upon a comparison of Plaintiff's and Harr's respective loan production figures in deciding to eliminate Plaintiff's job. The official minutes from the Bank's December 20, 2010, board of directors meeting reflect Pfahler's "communicat[ion] that based on loan demand he thought it would be prudent to reduce the size of the business development team" and "the position that should be eliminated is the position held by Patricia Steward." (ECF No. 40-11 at 2). As it pertains to Harr, the minutes reflect only that Pfahler "felt it was best to eliminate Mrs. Steward's position rather than Allen Harr's as Mr. Harr lives and is established in the Bedford market." (*Id.*). No mention is made in the minutes of a comparison between Plaintiff's loan production figures and those of Harr, and Pfahler acknowledged that the minutes accurately reflect the content of what he communicated to the board. (Pfahler Dep. 36-37, ECF No. 39-1). Viewed in the light most favorable to Plaintiff, this evidence would permit (although it would not require) a jury to conclude that the Defendant's comparison of Plaintiff's and Harr's respective loan production figures was a post-hoc fabrication proffered to cover up a discriminatory intent.

Plaintiff has also pointed to factors that arguably show some illogicality in the manner in which Pfahler made his decision. The evidence in this case suggests that the Bank's elimination of a job was a rare, if not unprecedented, event. In fact, Defendant's witnesses could recall only one other situation in which jobs had been eliminated through a similar reduction-in-force. (ECF No. 43 ¶ 30). Despite the exceptional nature of Pfahler's employment decision, Plaintiff points out that Pfahler did not consult with

anyone about his intention to eliminate a member of the Business Development Team until almost a year after he first started thinking about it. (Pfahler Dep. 21-22, 26-28, ECF No. 39-1). Not until late May or June 2010 did Pfahler discuss the issue with Campbell, and by that time Pfahler had a "pretty good idea" that Plaintiff's position would be the one eliminated. (Id. at 27-29). Although Pfahler testified that he looks at the loan production reports generated by Nagle every month (*id*. at 23, 27, 30) and "knew the numbers" (*id*. at 63), it is undisputed that he did not revisit these reports at the time he made his decision to eliminate Plaintiff's job (ECF No. 43 ¶ 39), nor did he discuss the loan production numbers with Campbell. (Pfahler Dep. 29-30, 44, ECF No. 39-1). Moreover, Pfahler ordered a summary report of the Business Development Team's performance only after Plaintiff had been terminated and filed her EEOC charge. (*Id*. at 51-52). Pfahler also did not review Plaintiff's performance evaluations at the time he made his decision (Pfahler Dep. 20-21, ECF No. 39-1), nor did he speak with Nagle, her direct supervisor. (ECF No. 43 ¶ 46). Viewing this evidence in Plaintiff's favor, a jury might reasonably infer that Pfahler's actions are indicative of a preordained decision to terminate Plaintiff's employment based on non-performance-based considerations.

Finally, Plaintiff has produced evidence of age-related remarks allegedly made by Pfahler that, she believes, demonstrate a discriminatory mindset. Most relevant, Plaintiff maintains that she spoke with Pfahler just days prior to her termination about the open position for branch manager of the Altoona branch office and inquired whether Pfahler had found anyone to fill the position. According to Plaintiff, Pfahler responded he had

not found anyone for the job and further remarked, "The only applications I got were from old people, and I don't want them." (Pl.'s Dep. 56, ECF No. 36-1; ECF No. 43 ¶ 27).

Defendant disputes the probative value of this alleged remark. As to the first comment, Defendant argues that Pfahler's reference to "older" applicants is not direct evidence of discrimination because the comment was not made in the context of considering *Plaintiff* for the branch manager position. In addition, Pfahler has testified that his reference to "older" applicants was merely an expression of his concern that the applicants were experienced and might therefore present salary demands that the Bank could not meet. (Pfahler Dep. 91, 98-99, ECF No. 29-5). Since the Bank ultimately hired Pat Labriola, a 62 year-old individual, as branch manager, Defendant insists that Pfahler's comments cannot reasonably be interpreted as reflecting ageist intent.

The Court does not agree that Pfahler's alleged comment lacks probative force as a matter of law. At the summary judgment stage, the Court must credit Plaintiff's version of the facts and afford her the benefit of any reasonable inferences arising from those facts. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (noting that "[t]he evidence of the nonmovant is to be believed" at the summary judgment stage, and "all justifiable inferences are to be drawn in his favor"). Given Pfahler's status as the relevant decisionmaker in this case and the temporal proximity of the alleged comment relative to Plaintiff's own termination, a jury crediting Plaintiff's testimony could reasonably view the alleged statement by Pfahler as reflecting a discriminatory animus that influenced Pfahler's decision to terminate Plaintiff's employment. Whether or not Pfahler's comment has probative value in light of Pfahler's decision to hire Labriola for the open branch

21

manager position is a matter best left for a jury to determine. *See Anderson*, 477 U.S. at 255 (noting that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions"). This is especially true in light of the fact that the record would permit an inference that Defendant made its decision to hire Labriola in April of 2011, *after* Plaintiff filed her charge of age discrimination with the EEOC. (*See* ECF No. 43, ¶ 65; Compl. ¶ 3(a)-(b), ECF No. 1).

Plaintiff claims that Pfahler also made age-related comments on another occasion. Plaintiff testified that, at a social function on an unspecified date, Pfahler was asked whether he had hired anyone for an open teller position at the Bank's main office; according to Plaintiff, Pfahler responded that "only old women are applying, and I want some nice young girls there." (Pl.'s Dep. 60, ECF No. 36-1). Defendant insists that, even if this remark is credited, it is at most a stray remark lacking any probative value because there is no evidence to suggest its temporal proximity to the employment decision at issue here.

The Court need not presently determine whether this alleged remark would be admissible at trial and/or whether it is independently probative of a discriminatory intent because, based on all of the evidence previously outlined, the Court finds that a reasonable jury could return a verdict for Plaintiff on her ADEA claim arising out of her loss of employment.[9] Because the record here evidences a genuine dispute relative to the issue of pretext, summary judgment is not warranted.

---

[9] The Court notes that Plaintiff has also proffered testimony concerning ageist remarks that were allegedly made by Leon Zook, a member of the Bank's board of directors who previously served as

## B. Defendant's Failure to Hire Plaintiff as the Altoona Branch Manager

Plaintiff also alleges age discrimination in connection with the Defendant's refusal to hire her for the open branch manager position in its Altoona office. There is no dispute that Plaintiff expressed interest in this position at the time of her termination meeting. Plaintiff claims that, when she asked about the open position, Pfahler and Campbell "just stared" at her. (Pl. Dep. 43-44, ECF No. 36-1). Plaintiff subsequently called Pfahler after she got home that day and left a message concerning the branch manager job, but she did not receive any word back. (*Id.* at 49, 53-54). She followed up by mailing an application for the job to Pfahler, but she was not hired or even interviewed for the position. (*Id.* at 52-53; Pfahler Dep. 84).[10] Instead, the Bank hired Patrick Labriola as the new branch manager.

---

its president and CEO from 1985 through 2003. (ECF No. 43 ¶ 21). Zook first met Plaintiff when she applied for a position with the Bank, and he was involved in the decision to hire her. (*Id.* at ¶ 22). According to Plaintiff, Zook subsequently remarked on at least two occasions that, if he had known how old Plaintiff was, he would not have hired her. (Steward Dep. 57-61, ECF No. 36-1). Although Defendant contends that these alleged comments should be disregarded as non-probative stray remarks, the Court need not address this issue because of its conclusion that other evidence in the record independently supports a reasonable finding of pretext.

[10] Although Defendant contends that it never received an application from Plaintiff (*see* ECF No. 40-3 ¶ 8; Pfahler Dep. 89, ECF No. 39-1), the Court will credit Plaintiff's testimony that she mailed an application to Pfahler which was never returned to her through the U.S. mail. (Pl. Dep. 52-53, 86, ECF No. 36-1). Defendant contends that, even if Plaintiff sent the application as she claims, she sent it to the wrong person (i.e., Pfahler), instead of to Campbell, as the advertisement instructed. Given the small size of the Bank, Plaintiff's verbal notice of interest to Pfahler, and the fact that Pfahler made the hiring decision, the record would permit a reasonable inference that Plaintiff satisfied any formal application requirements relative to the branch manager position. (*See* Pl. Dep. 52-53, ECF No. 36-1).

### 1. *Prima Facie* Case

Defendant contends that Plaintiff cannot establish a *prima facie* case of age discrimination based on this hiring decision because she cannot show that the Bank hired an individual sufficiently younger than herself to permit a reasonable inference of discrimination. There is no dispute that Labriola was 62 years-old at the time he was hired, and his birthday—December 2, 1949 (*see* ECF No. 40-3 ¶ 9)—makes him approximately three and one-half years younger than Plaintiff.

Although the parties disagree about whether Labriola's age precludes him from being a suitable comparator, the Court need not resolve this particular dispute at the present juncture because evidence of a sufficiently younger comparator is not the only means by which Plaintiff can establish her *prima facie* case. An employee can also show more generally that the employer declined to hire her under circumstances that are sufficient to support an inference of discrimination. *See Landmesser v. Hazleton Area School Dist.*, No. 14–1188, 2014 WL 3562753, *1 (3d Cir. July 21, 2014) (discussing the elements of a *prima facie* age discrimination claim based on a failure to hire and noting that a plaintiff must show, under the fourth element, that "circumstances giving rise to an inference of discrimination accompanied the failure to hire" the plaintiff) (citing *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003)). Here, the evidence is ambiguous as to the precise hiring date of Labriola, but, as previously noted, a jury could conclude that he was hired in April 2011 *after* Plaintiff filed her administrative charge with the EEOC alleging age discrimination. (*See* ECF No. 34, Pl.'s Resp. to ¶ 95; Campbell Dep. 77, ECF No. 37-2). When the evidence—including Pfahler's alleged comment about the "old people" who

24

had applied for the branch manager job—is viewed in the light most favorable to Plaintiff, it could support a reasonable finding that Defendant's failure to hire Plaintiff for the branch manager position occurred under "circumstances giving rise to an inference of age discrimination." *Landmesser*, 2014 WL 3562753 at *1.

### 2. Pretext

To meet its burden of production under the *McDonnell*-Douglas test, Defendant has asserted that it did not hire Plaintiff for the branch manager position because she did not apply for the job (*see* ECF No. 40-3 ¶ 8; ECF No. 40-8 at 3) and because, in any event, she would not have been a good fit for that position. Defendant contends that the Altoona branch was suffering from significant morale problems, and it therefore needed a manger with team-building skills. According to Defendant, prior experience showed that Plaintiff lacked these skills, whereas Labriola was believed to possess strong communication and morale-building skills.

Viewing the evidence of record in its entirety and in the light most favorable to Plaintiff, the Court concludes that a jury could reasonably reject the Defendant's proffered explanation and find that Plaintiff was passed over for the branch manager position because of her age. Plaintiff has produced sufficient evidence to establish that she expressed interest in the branch manager job contemporaneous with her elimination from the Business Development Team but was never interviewed or considered for the position. Based on the parties' contradictory accounts, a jury could discredit the Banks's suggestion that Plaintiff was not hired because she did not apply for the job. In addition,

25

the Court has already determined, based partly on Pfahler's alleged ageist comments in connection with the branch manager position, that there is sufficient evidence to support a finding of age discrimination relative to the Defendant's decision to eliminate Plaintiff from the Business Development Team. Such a conclusion, if drawn by the jury, would further support a finding that Plaintiff's age was similarly a motivating factor in the Bank's contemporaneous refusal to hire her as manager of the Altoona branch office. Because a jury could reasonably return a verdict in Plaintiff's favor on this age discrimination claim, summary judgment is not warranted.

## C. Defendant's Failure to Hire Plaintiff as the Altoona Assistant Branch Manager

Finally, Plaintiff clams that the Bank discriminated against her based upon her age when it failed to hire her as the assistant branch manager of the Altoona office. It is undisputed that this position was open as of December 2010, the month before Plaintiff's termination. Defendant hired Terry Drass to fill the position on December 30, 2010. (ECF No. 40-8 at 3). Drass was born in 1961 (*id.*) and is sixteen years younger than Plaintiff. The evidence is uncontroverted that Campbell and Pfahler never had any discussion about hiring Steward as the assistant branch manager and never gave any consideration to placing her in that position. (ECF No. 43 ¶ 69).

Defendant contends that Plaintiff cannot establish a *prima facie* case in regards to this claim because Plaintiff cannot show that she was qualified for the position. Pfahler testified that Plaintiff was not qualified to be the assistant branch manager because she was "not familiar with the money part of the job." (Pfahler Dep. 80-81, ECF No. 39-1).

26

These tasks included handling the ATM, balancing the vault, scheduling the teller line, and taking loan applications. (*Id*. at 81). Pfahler concluded that Plaintiff was unfamiliar with these responsibilities because she had not performed them while serving as branch manager of the Duncansville office. (Pfahler Dep. 81.)

Defendant also argues that Plaintiff cannot show that its reasons for the employment decision were pretextual. Defendant states that Plaintiff was not offered the job because it was not open at the time that her position on the Business Development Team was eliminated. Defendant further states that Drass was given the permanent position of Assistant Branch Manager because she had already been performing the job admirably for a year while the original assistant manager was on family leave. Defendant maintains that Plaintiff had no right under the ADEA to be hired as assistant branch manager because the ADEA is not a "bumping" statute.

### 1. *Prima Facie* Case

Defendant first contends that Plaintiff was not qualified for the Assistant Branch Manager position because she had not performed certain money-related tasks while operating as manager of the Duncansville office. (Pfahler Dep. 80-81, ECF No. 29-5).[11] The Court does not agree that summary judgment is warranted on this basis. Courts employ an objective standard in determining at the *prima facie* stage whether a plaintiff is qualified to perform the job at issue, *see Sempier v. Johnson & Higgens*, 45 F.3d 724, 729 (3d

---

[11] Pfahler acknowledged that he never asked Plaintiff whether she was performing these functions and instead based his assessment of her abilities in this regard on "third hand information" from bank tellers. (Pfahler Dep. 81, ECF No. 39-1).

Cir. 1995) (citing authority), and the plaintiff's burden at this stage of the analysis is "not intended to be onerous." *Williams v. St. Joan of Arc Church*, 226 F. App'x 180, 183 (3d Cir. 2007) (citing *Sempier*, 45 F.3d at 728). *See also Turner v. Schering–Plough Corp.*, 901 F.2d 335, 342 (3d Cir.1990) (an ADEA plaintiff's *prima facie* burden requires him to demonstrate merely that he "was qualified by training and experience for the job" at issue).

Here, it is undisputed that Plaintiff had over thirty years of job experience in the banking industry. (Pl. Dep. 12-13, ECF No. 36-1). She spent more than eleven years working for the Defendant, and this included a four-year stint as branch manager of Defendant's Duncanville office. Pfahler acknowledged that the responsibilities of the assistant branch manager are essentially the same as those of the branch manager. (Pfahler Dep. 81, ECF No. 39-1). A jury viewing this record could reasonably infer that Plaintiff was objectively qualified by virtue of her training and experience to perform the functions of an assistant branch manager, even if she would have required some additional training to learn the "money aspects" of the job.[12] As Defendant has not demonstrated the absence of a genuine issue of material fact relative to the other elements

---

[12] To the extent Pfahler's testimony references an alleged prior unwillingness on Plaintiff's part to have been trained in the money-related tasks of her job while serving as the Duncansville branch manager, this entails a subjective inquiry not suitable for resolution at the *prima facie* stage. *See Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990) (noting that "objective job qualifications should be considered in evaluating the plaintiff's prima facie case," while "a subjective quality . . . is better left to the later stage of the *McDonnell-Douglas* analysis"). In any event, however, there is evidence from which a factfinder could reasonably infer that Plaintiff's failure to perform the money-related tasks was not the result of an unwillingness to learn them, but rather the result of upper management's directions to her that she should be out generating business for the bank while her assistant manager, Block, handled the day-to-day responsibilities of the office. (ECF No. 34 ¶¶ 3-4).

28

of Plaintiff's *prima* facie case, summary judgment at this stage of the analysis is not appropriate.

## 2. Pretext

Defendant maintains that Pfahler never considered Plaintiff for the assistant branch manager job because it was not vacant as of January 2011 when Plaintiff's position on the Business Development Team was terminated. The failure of a plaintiff to formally apply for a position does not necessarily preclude him or her from maintaining a discriminatory failure-to-hire claim under the federal anti-discrimination statutes. *See Equal Employment Opportunity Commission v. Metal Service Co.*, 892 F.2d 341, 348 (3d Cir.1990) (involving Title VII claim). In order to maintain an action under such circumstances, however, a plaintiff must show that his interest in the relevant position was known to the employer, or that the employer used a secretive selection process in order to prevent members of a statutorily protected class from applying. *See Metal Service Co.*, 892 F.2d at 348-352; *Burrows v. Township of Logan*, Civil Action No. 05-458J, 2008 WL 4274369 (W.D. Pa. Sept. 17, 2008).

In this case, the evidence establishes that Pfahler knew, as of June 2010, that Plaintiff's position would be eliminated, but he claims he decided to put the termination off until January 2011, allegedly to give her the benefit of a full employment year. (Pfahler Dep. 28-29, 37-38, ECF No. 39-1). Thus, as of December 30, 2010, when the assistant branch manager position was filled, Pfahler knew that Plaintiff's employment on the Business Development Team would imminently be terminated, and he could have

inquired of Plaintiff about her potential interest in the job, as he ultimately did with Drass. (*Id*. at 82). A jury viewing the evidence in Plaintiff's favor (and somewhat cynically) might construe the timing of these events as a disingenuous attempt by Pfahler to avoid offering Plaintiff an opportunity for alternative employment with the Bank.

Defendant further maintains that Drass was chosen for the assistant branch manager position because she had already been performing the job functions admirably for a year and deserved the job. (Pfahler Dep. 79, ECF No. 29-5). Under these circumstances, Defendant contends that Plaintiff would not have been entitled to placement in the open assistant branch manager position because the ADEA is not a "bumping" statute. As Plaintiff points out, however, Drass was employed as a teller and had been assuming the duties of the branch manager and the assistant branch manager while those individuals were on leave. (Pfhaler Dep. 79-80). Accordingly, Drass would not have been "bumped" from her official job had Plaintiff been hired as the assistant branch manager. Finally, the jury's ability to infer age discrimination as a motivating factor in Plaintiff's discharge potentially taints Defendant's explanation as to why it never considered Plaintiff for the assistant branch manager position. A question of fact exists as to whether Plaintiff was excluded from consideration because of nondiscriminatory reasons or because of her age. Accordingly, summary judgment is not warranted with respect to this aspect of Plaintiff's ADEA claim.

## VI. Conclusion

For the reasons stated above, the Court finds that the evidence is sufficient to permit a reasonable trier of fact to find for the Plaintiff relative to her various age discrimination claims. Accordingly, Defendant's motion for summary judgment will be denied.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PATRICIA STEWARD, | ) | Civil Action No. 3:12-203 |
| | ) | |
| Plaintiff, | ) | Judge Kim R. Gibson |
| | ) | |
| v. | ) | |
| | ) | |
| ALTOONA FIRST SAVINGS BANK, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER OF COURT

AND NOW, this **8th** day of September, 2014, upon consideration of Defendant's

motion for summary judgment (ECF No. 30), and in accordance with the accompanying

memorandum opinion,

**IT IS HEREBY ORDERED** that Defendant's motion for summary judgment is

**DENIED**.

BY THE COURT:

KIM R. GIBSON
UNITED STATES DISTRICT JUDGE